Per Curiam:
This is a suit by plaintiff to recover $360,921.60 claimed to be due under a price redetermination of contract No. DA 30-069-OBD-938 entered into on September 5, 1952, with the Department of the Army for the production and delivery of ninety-millimeter shells. The complaint shows that the parties executed a supplemental agreement to the contract on June 4, 1957, wherein it was stated that plaintiff accepted a sum of $324,748.25 as “a full and complete settlement for complete performance of the contract”. Plaintiff contends that this instrument is not a valid waiver or relinquishment of plaintiff’s claim herein, alleging that it was obtained by economic duress. Defendant has asserted two affirmative defenses in which it contended that plaintiff’s execution of the supplemental agreement and receipt of the sum thereunder constituted a full and complete settlement of all sums due to plaintiff under the contract, creating an accord and satisfaction, and that plaintiff was guilty of laches in having failed to assert that any further sums were due it under the contract when it executed the supplemental agreement and received the sum due thereunder. Upon consideration of the pleadings filed herein, the argument of counsel for the parties and the findings of fact of the trial commissioner, the court approves the said findings and concludes that the plaintiff has failed to make a sufficient showing of duress in execution of the supplemental agreement and therefore that the settlement reached thereunder is binding. Plaintiff is not entitled to recover and its petition is dismissed.
*840 The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is, and at all times pertinent hereto has been, a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Roselle, New Jersey. Plaintiff manufactures metal products for both civilian and military use.
2. Under date of September 5,1952, plaintiff entered into a contract (No. DA-30-069-ORD-938) with defendant, acting by a contracting officer of the New York Ordnance District, Department of the Army, whereby plaintiff was to furnish and deliver to defendant, over a period of 18 months ending in February 1954, 115,800 90 MM shells at a unit price of $15.13, thereby making the total price $1,752,054. The contract contained a “Price Redetermination” provision under which, upon completion of delivery of 40 percent of the shells, the parties were required to negotiate to revise the price thereof. The contract provided, however, that the total maximum revised contract price could not exceed $1,875,653.80.
Thereafter, the contract was, by change orders and supplemental agreements, modified over 80 times. By supplemental agreements Nos. 77 and 82, dated June 11, 1955 and August 15, 1955, respectively, the contract was amended to provide for the delivery of 160,300 shells through June 1956 at a total contract price of $3,648,322.39, with the revised contract price not to exceed $4,166,641.34.
The contract, as amended through said supplemental agreement No. 82, also contained the following provisions:
2. Changes
The Contracting Officer may at any time, by a written order * * * make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; * * *. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this *841 contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” * * *
7. PAYMENTS
The Contractor shall be paid, upon the submission of properly certified invoices or vouchers, the prices stipulated herein for supplies delivered and accepted or services rendered and accepted, less deductions, if any, as herein provided. Unless otherwise specified, payment will be made on partial deliveries accepted by the Government when the amount due on such deliveries so warrants; or, when requested by the Contractor, payment for accepted partial deliveries shall be made whenever such payment would equal or exceed either $1,000 or 50 percent of the total amount of this contract.
$ * $ $ *
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract *842 and in accordance with the Contracting Officer’s decision.
3$ $ ‡ ‡ $
36. Price redetermination * * *
(a) The prices stated herein may be increased or decreased in accordance with this clause. In no event shall the revised price exceed $4,166,641.34.
(b) Times for negotiation.
(1) Upon completion of delivery of 40 percent of Item 1 to be furnished under this contract, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Within not to exceed thirty (30) days after the completion of delivery referred to above, the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this clause. At any time and from time to time after the completion of delivery referred to above, subject to the limitations specified in this clause, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to adjust the prices under this contract. No demand shall be made prior to 90 days after completion of delivery referred to above, and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand. Each demand shall specify a date (identical with or subsequent to the date of the delivery of the demand) as of which the revised prices shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as “the effective date of the price redetermination.” For the purposes of the first negotiation contemplated by this paragraph, the date of execution of this contract shall be deemed to be the effective date of the price redetermination. Any demand under this clause, if made by the Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in paragraph (c) of this clause. If the demand is made by the Government, such statements and data will be furnished by the Contractor within 30 days of the delivery of the demand.
* ❖ * #
(c) Submission of data. — At the time or each of the times specified or provided for in paragraph (b) of this clause the Contractor shall submit (i) a new estimate and breakdown of the unit cost and the proposed prices of the items remaining under this contract after the *843 effective date of the price redetermination, * * * _(ii) an explanation of the differences between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices imder a new contract. The Government may make such examination of the Contractor’s accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.
(d) Negotiations.
(1) Upon the filing of the statements and data required by paragraph (c) of this clause, the Contractor and the Contracting Officer will negotiate promptly in good faith to agree upon prices for items to be delivered on and after the effective date of the price redetermination. Negotiations for price redetermination under this clause shall be conducted on the same basis, employing the same types of data (including, without limitations, comparative _ prices, comparative costs, and trends thereof) as in the negotiation of prices under a new contract.
(2) After each negotiation the agreement reached will be evidenced by a supplemental agreement stating the redetermined prices to be effective with respect to deliveries on and after the effective date of the price redetermination (or such other later date as the parties may fix in such supplemental agreement).
(e) Disagreements. — If within 30 days after the date on which the statements and data are required pursuant to paragraph (b) of this clause to be filed (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to redetermined prices (which term for the purpose of this clause shall include direct costs, indirect costs and profit), the failure to_ agree shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes,” and the prices so fixed shall remain in effect until the effective date of the price revision next following such disagreement.
(f) Payments. — Until new prices shall become effective in accordance with this clause, the prices in force *844 at the effective date of tbe price redetermination shall be paid upon all deliveries, subject to appropriate later redetermination made pursuant to paragraph (d) or (e) * * * of this clause.
* # # # #
3. (a) Prior to the execution of said shell contract, plaintiff had obtained on February 5, 1951, pursuant to the provisions of the Defense Production Act of 1950 and Regulation V of the Board of Governors of the Federal Reserve System, a so-called “V-loan” to finance the production under its defense contracts. Said loan in an amount not to exceed $1,800,000, in the form of a revolving credit providing for advances in accordance with a “loan formula”, was made by the National State Bank of Newark, Newark, New Jersey, which advanced two-thirds, and the Union County Trust Company, Elizabeth, New Jersey, which advanced one-third, and was guaranteed to the extent of 90 percent thereof by the Department of the Navy, acting through the Federal Reserve Bank of New York as fiscal agent of the United States.
By a Loan Agreement dated February 27, 1953, between plaintiff and the same banks, and a V-loan Guarantee Agreement dated March 3, 1953, between the banks and the Department of the Army, said loan was replaced by a new loan in an amount not to exceed $1,400,000 (later increased to $1,500,000), but guaranteed by the Department of the Army, which by that time had become the department with the preponderance of contracts held by plaintiff. The loan was secured by an assignment of all moneys due or to become due arising out of defense production contracts with the original face amount of over $14,000,000 and with approximately $6,000,000 of items covered thereby remaining to be delivered.
(b) Under the “loan formula”, the amount of the borrowing, within the ceiling amount of the loan, was restricted to stated percentages of the sum of certain items, including “90% of accounts receivable for delivery of finished products or for services rendered under the assigned defense production contracts, plus 80% of the cost of inventory acquired or produced for use in the performance of the assigned defense production contracts; * * *.”
*845 (c) The Loan Agreement provided in part as follows:
6. EVENTS OE DEFAULT.
❖ ❖ * ❖ *
(b) Defaults which Permit Optional Acceleration of Maturities. In tlie event that (1) the Borrower shall fail * * * duly to perform and observe any of the terms or provisions of this Agreement on the part of the Borrower to be performed or observed; * * * then, in any such event, the Financing Institution or the Guarantor is authorized, in its discretion, by written notice to the Borrower, to declare any obligation of the Financing Institution to make any further loan to the Borrower under this Agreement to be terminated, whereupon such obligation shall be terminated, and, whether or not such declaration is made, to declare any or all of the Liabilities to be forthwith due and payable, whereupon, notwithstanding any credit or time allowed to the Borrower by any instrument evidencing any of the Liabilities or otherwise, all such Liabilities so declared to be due and payable shall be and become forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which the Borrower hereby waives; subject, however, to any prior written consent of or notice by the Guarantor, required by the Guarantee Agreement, to such acceleration of maturity.
* * * * *
14. The Borrower covenants and agrees that (1) if at any time either the unpaid principal amount of the Loan is ascertained by the Borrower to be in excess of the limitation set forth in the loan formula included in paragraph 15 hereof, or the borrowing base indicated in any loan formula certificate furnished by the Borrower to the Financing Institution is ascertained by the Borrower to be overstated in value, the Borrower will forthwith notify the Financing Institution of such excess or overstated value, and within ten days thereof Say to the Financing Institution for application in re-uction of the Loan an amount equal to such excess, or as the case may be, an amount equal to the excess borrowing based upon such overstated value, and (2) if at any time the Financing Institution or the Guarantor has reason to believe that the unpaid principal amount of the Loan is in excess of the limitation set forth in the loan formula or that the borrowing base indicated in any loan formula certificate furnished by the Bor *846 rower is overstated in value, and has so notified the Borrower in writing, then in each and every instance within ten days after the mailing of such notice, the Borrower will pay to the Financing Institution for application in reduction of the Loan an amount equal to such excess or, as the case may be, an amount equal to the excess borrowing based upon such overstated value.
Sc * >S * *
16. The Borrower covenants and agrees that the proceeds of the Loan under this Agreement shall be used solely to provide or replenish working capital in connection with the performance of the assigned defense production contracts.
( d) Section 7 of the V-loan Guaranty Agreement provided in part as follows:
* * * The Holder [the two banks], unless prior objection thereto shall have been made in writing by the other party [Department of the Army], may extend the term of the loan, but, without the prior written consent of the other party [Department of the Army], not more than once and for not more than sixty [60] days; but notice of any such extension shall be thereafter promptly transmitted to the other party. * * *
4. The price redetermination point under the contract was, by agreement of the parties, fixed upon the delivery of 58,900 shells in June 1955. On September 8, 1955, plaintiff submitted to the contracting officer its redetermination cost statement and, based thereon, claimed a redetermined total contract price of $4,140,697.33 exclusive of $76,180.90 for “preproduction costs,” which costs, by supplemental agreement No. 15 dated June 20, 1953, were, “subject to audit,” made allowable “in an amount not to exceed” said figure.
5. Thereafter, and commencing in February 1956, the contracting officer, together with other officials of the defendant, held a number of meetings with officials of the plaintiff to negotiate a redetermined price figure pursuant to Article 36(d) of the contract, set forth above. Meetings were held on February 6, 9, 20, 24, and 27, 1956. At the meeting of February 20, defendant’s officials offered a total price of $3,573,000. This was based on plaintiff’s original estimated price, which defendant’s representatives felt had been borne *847 out. Plaintiff rejected this offer. On February 24, defendant’s representatives increased the offer to $3,600,000, which was also rejected. On February 27, at a meeting held at plaintiff’s plant, defendant’s representatives offered a total price of $3,625,000. Plaintiff’s officials rejected this offer and instead requested a price of $3,776,000. Defendant’s officials stated they might be able to increase their figure by $25,000, making the total price $3,650,000. When the meeting terminated, defendant’s officials stated they would do their best to obtain an approval by the defendant’s authorized officials of the $3,650,000 figure, and that they felt quite certain they could obtain final approval of such figure. When they left, they were under the mistaken impression that plaintiff would accept such figure, of which they had little doubt they could obtain an approval, and that the lengthy negotiations had come to an end. However, plaintiff’s officials did not accept any such tentative figure at this meeting, made no commitments about accepting it in the future, and in fact were dissatisfied with it. Prior to the submission by defendant’s representatives of the data necessary to obtain the contracting officer’s approval of such figure, plaintiff’s refusal to accept it became known, so further efforts in that direction ceased.
As a result, another meeting was held in the contracting officer’s offices on March 15, 1956. At this meeting, the contracting officer offered said $3,650,000 figure but plaintiff rejected it. The contracting officer stated that if such figure were not accepted and he would be obliged to make a unilateral determination, he would redetermine the price to be in the lower amount of $3,390,975.90 which figure was based upon the cost findings of the Army Audit Agency. This agency had audited plaintiff’s books and records to determine the costs incurred in producing the shells which the agency auditors felt were applicable and allowable in accordance with accounting principles relating to the type of contract involved. Plaintiff’s representatives replied that they would be obliged to appeal such a figure, but the contracting officer pointed out the length of time and expense that would be involved in such appeal proceedings. He also pointed out that a finding based on the lower Army Audit Agency amount would mean that plaintiff would be over *848 paid on tbe basis of payments already made to it by approximately $81,000, which the defendant would be obliged to recapture.
The same $8,650,000 figure was offered and rejected at another meeting in the contracting officer’s offices on April 10,1956.
All of the above offers by defendant were exclusive of the preproduction costs referred to in finding 4.
6. On April 30, 1956, the contracting officer unilaterally redetermined the contract price to be $3,390,975.90. Of this total, $3,314,795 was assigned directly to the shells. The $76,180.90 balance was allowed for preproduction costs. As set forth in finding 5, this redetermination figure was based upon the cost findings of the Army Audit Agency, to which was added an amount for profit. Said cost findings consisted only of those costs which were clearly supported by plaintiff’s records, and which the auditors had no doubt were allowable. Other claimed costs not so supported or not clearly allowable, but which, in the exercise of business judgment and experience could be allowed in whole or in part (although not allowable on the basis of strict accounting principles), were not allowed. As a matter of negotiation and settlement, the contracting officer felt he could, through the application of certain pricing principles based upon factors other than cost, as well as the allowance of certain costs not wholly supported by the records, justify a higher amount as a fair redetermination figure. However, feeling he could go no higher than $3,650,000, but failing to obtain acceptance by plaintiff of such figure, which he considered to be in the nature of a compromise, he felt he was justified in reverting to and relying upon the supported cost findings of the auditors, without adjustment, and adding thereto a profit allowance which he considered to be reasonable.
Upon the basis of the record herein, restricted as it is to the limited issue presented of the plaintiff’s standing to prosecute this case in view of a certain document it executed, as hereinafter set forth, and consequently not being addressed to the merits of the adequacy of the price redetermi-nations made by defendant, the evidence does not indicate *849 that the Army Audit Agency’s cost determination, or the contracting officer’s price redetermination, were arbitrary, capricious, or so grossly erroneous as to. imply bad faith. Similarly, the evidence does not indicate that the contracting officer acted in bad faith either in urging plaintiff to accept the higher compromise figure he proposed or in ultimately adopting the lower redetermination figure.
7. (a) The contracting officer’s unilateral price redeter-mination placed plaintiff in a difficult financial position. Considering the payments previously made by defendant to plaintiff under the contract, such determination resulted in plaintiff’s being overpaid by approximately $81,000, which amount was consequently repayable to defendant. This left plaintiff with a cash deficiency with which to pay the bills of its contract suppliers and other creditors. Furthermore, since the contract basis against which plaintiff’s Y-loan was made was lowered, plaintiff, under the Y-loan formula, became overborrowed, thus placing plaintiff in default. As of May 9, 1956, the loan was overdrawn to the extent of approximately $256,000 on the Y-loan formula basis (90 percent accounts receivable and 80 percent of inventory). As a consequence, by the provisions of section 6(b) of the Loan Agreement, set forth in finding 3, plaintiff’s Y-loan was subject to being declared due and payable forthwith.
(b) On May 24, 1956, a meeting was held at the office of the Federal Eeserve Bank of New York to review plaintiff’s situation with respect to its Y-loan. Present at the meeting were representatives of the plaintiff, the Army Ordnance Corps, the Army Audit Agency, the contracting officer’s office, the National State Bank of Newark, and the Federal Eeserve Bank. Plaintiff’s operations and balance sheets were reviewed. Plaintiff’s representatives stated, among other things, that they intended to pursue the price redetermination matter further with the defendant in an effort to obtain a higher price and thus ease plaintiff’s financial problem. As a result of the meeting, both the Army and the Federal Eeserve representatives agreed not to take any default action against plaintiff on its Y-loan provided the deficiency therein did not increase, and instead to extend the maturity date of the loan on a month-to-month *850 basis. V-loan advances on contracts other than the instant shell contract could be made, but any such advances would have to be on a basis that would not increase the loan deficiency. Further, to ease plaintiff’s cash deficiency, the representative of the National State Bank of Newark agreed that the bank would lend additional moneys to plaintiff, taking the accounts receivable from plaintiff’s commercial business as security.
8. (a) On May 29,1956, negotiations continued at another meeting between plaintiff’s and defendant’s representatives at which the contracting officer again offered $3,650,000 and urged plaintiff to accept that figure, but plaintiff again rejected it.
(b) A timely appeal from the contracting officer’s decision was taken by plaintiff to the Secretary of the Army under the “Disputes” article of the contract. In that appeal plaintiff claimed $3,683,422.55 in costs and $360,921.60 in profit, for a total price of $4,044,344.15.
(c) Just before the commencement of the appeal hearing on September 26, 1956, there was another attempt to negotiate but defendant’s representatives would again go no higher than $3,650,000. This offer was once more rejected by plaintiff.
9. On May 2, 1957, a three-member panel of the Armed Services Board of Contract Appeals, acting as the representative of the Secretary of the Army, rendered a detailed 48-page decision on plaintiff’s appeal. By this decision, which was unanimous, the total production costs were fixed at $3,196,765.29 and the preproduction costs at $74,206.55, making the total costs $3,270,971.84. To this was added profit in the amount of $412,450.71, making the total redetermined contract price $3,683,422.55. As shown by finding 8, this was the exact amount which plaintiff had claimed in its appeal as constituting its costs, exclusive of profit. The Board’s decision stated in parts as follows:
89. In connection with this discussion of profit, it should be kept in mind that the purpose of this proceeding^ to arrive at a proper price for the contract. To arrive at a proper price it is necessary to consider factors other than cost and profit. Cost is but one factor to be considered — although because of the evidence *851 presented to us we found it necessary to consider it at considerable length.
90. In connection with this discussion of profit it must also be kept in mind that the cost-plus-a-percentage-of-cost system of contracting is, insofar as Government contracts are concerned, prohibited by statute.
91. The Army Procurement Procedure contains the following statement with respect to factors to be considered m price redetermination negotiations between contractors and contracting officers:
“b. Administration of Price Redetermination .Clauses. The following policy will apply to the administration of all price redetermination clauses:
(1) In price revision negotiations, the objective of the Contracting Officer shall be to negotiate a fair and reasonable revised price in which due weight is given to all relevant factors, including those taken into account when the initial contract price was negotiated. By way of illustration, but not limitation, full consideration shall be given to such matters as the Contractor’s general performance, efficiency, economy and ingenuity displayed in meeting contract requirements, including the delivery schedules, quality of the product, the character and extent of the subcontracting, cost data including questioned costs and the allocability and reasonableness of costs, changes in market conditions, competitive aspects of the original negotiation, as well as tibe competitive prices for the same or similar items, extent of Contractor’s technical, production and financial risk, and Government assistance in the form of facilities, equipment,. or financing. All of the above factors shall be considered to the. extent, pertinent to the specific negotiation and no price revision negotiation shall be based solely on a single factor. The record of the negotiations should be in sufficient detail to reflect the most significant considerations controlling the establishment of the revised price.
(2) Compliance with the policy stated in paragraph (1) requires that Contracting Officers rely on educated judgment and not on mechanical rules or mathematical formulas. Compliance further requires that pricing decisions shall not be made solely on the basis of a determination of cost and profit. It follows that the Contracting Officer need not negotiate agreements with Contractors as to the individual elements of cost.

We have already devoted considerable consideration to costs insofar as the contract price is concerned. We *852 will now consider such, evidence as has been presented to us as it relates to other factors mentioned in the above quotation.
íj: % #
106. In determining what the price should be we also note that the Contracting Officer who issued the decision as to what the revised price should be did not completely cover with Appellant all elements of Appellant’s case, and did not know (?remember?) whether comparative prices, comparative costs, or trends in prices were considered. (The contract, incidentally, calls specifically for such considerations.) He also thought that the price in his findings was less than the price at which he would have been willing to settle could a negotiated settlement have been reached.
# # sj: >;« #
108. When we considered cost we reached a cost figure of $3,196,765.29 for shell and $74,206.55 for “Item 2” for a. total of $3,270,971.84. Cost is but one factor for consideration and in paragraphs 88 through 91 above, we considered other factors. Considering these other factors together with cost, we think that the addition of $412,450.71 to our cost figure of $3,270,971.84 results in a redetermined price which is fair and proper insofar as both parties are concerned.
109. We find the redetermined price to be $3,683,-422.55. (Average $22.9783+). This price is $360,921.60 less than requested by Appellant ana $324,748.95 more than allowed by the Government. Had we considered costs only our redetermined price would have been considerably lower. Consideration of other factors, apparently not considered by the Contracting Officer, result in a higher redetermined price. We point particularly to the evidence before us on other prices for the item. When allowance is made for quantities, government-furnished property, delivery schedules, and omitted parts, a unit price of $22+ is, in our opinion, indicated. At $22.00, we would have a price of $3,526,-600. We point also to the lengthy extension of the contract through no fault of the Appellant. Considerations of cost and profit history alone would indicate a figure below that at which we have arrived. Consideration of other price redeterminations alone would result in a higher figure. But on the basis of all the evidence we believe that the price we have found is proper; that on the basis of a reasonable allocation of costs to the contract, it provides a liberal allowance for profit to the *853 Contractor; and that on the basis of other factors, it provides a fair price to the Government.
Upon the basis of the record herein, restricted as it is to the limited issue presented as set forth above, the evidence does not indicate that the Board’s decision was arbitrary or capricious, without substantial basis in the evidence before it, or even erroneous in any respect.
10. On May 2, 1957, just prior to the Board’s decision, plaintiff had accounts payable of approximately $800,000 and liquid assets of only approximately $675,000. As of that date, the balance due on its V-loan was approximately $218,900.
11. (a) During the period between the unilateral determination of the contracting officer and the Board decision, plaintiff fell behind in its payments to its suppliers, and these creditors pressed plaintiff for payment. They also made frequent inquiry of the National State Bank of Newark. Two of plaintiff’s important suppliers of materials for the performance of the shell contract that were pressing plaintiff had accounts which were long overdue. One of these creditors, Eastern Tool & Manufacturing Company, had carried plaintiff on its books from December 1955 by conversion of part of plaintiff’s debts to notes. Eastern Tool had, over a long period of time, satisfactory business dealings with plaintiff and was willing to wait for payment until the Board’s decision. As of the date of the Board’s decision, plaintiff owed Eastern Tool $76,205.70 on open account and $199,918.39 in notes which were given in return for aged accounts payable.
(b) The other creditor with accounts long past due was Stone Container Corporation, a supplier of corrugated cartons. This creditor also forestalled taking drastic collection action against plaintiff because of plaintiff’s pending appeal. As of the date of the Board’s decision, plaintiff owed this creditor $27,074.92 on open account, some of the items of which were incurred as long ago as October 1956.
12. Pursuant to the agreements arrived at at the meeting of May 24, 1956 (finding 7 (b)), the maturity date of the V-loan had been successively extended to May 31, 1957.
*854 13. Shortly after the Board’s decision, the contracting officer considered whether to seek a reconsideration by the Board. He was dissatisfied with the decision, feeling that the Board had awarded more money to plaintiff than it was entitled to. However, he concluded that if plaintiff would accept the decision, he would also. Thereupon, a duly authorized representative of the defendant inquired of plaintiff’s attorney and plaintiff’s vice-president whether plaintiff was willing to accept the Board decision and to close out the contract. He stated that if plaintiff would accept the decision, the contracting officer would also, thus ending the matter. Plaintiff’s vice-president stated that he wished to give the question further consideration, that he desired to consult his attorney, and that he would thereafter advise defendant of his decision. Plaintiff’s officers were likewise dissatisfied with the Board decision, which fixed a contract price that was less than the amount plaintiff sought by $360,921.60.
14. Plaintiff’s officers weighed the advisability of taking such further proceedings as were available to increase the amount of the price redetermination. In this connection, they consulted with their attorney who had represented them in the Board proceedings. The attorney advised them that in his opinion the Board’s award was insufficient and that further proceedings to attempt to increase the amount due, either by seeking reconsideration by the Board within 30 days, or by instituting court proceedings, would be legally justified. He also advised that the defendant too could seek reconsideration by the Board so that there was a risk involved in such proceedings. He further advised, however, that in view of plaintiff’s then pressing need for immediate funds and the length of time such further proceedings would take, the ultimate determination as to whether the Board decision should be accepted was essentially a business one for plaintiff itself to make. Plaintiff’s attorney had formerly been a contracting officer and the District Director of the New York Ordnance District. He was, therefore, familiar with the District’s policies and procedures in such matters. He explained to plaintiff’s officials that if they accepted the Board’s decision they would, in order to obtain the moneys *855 due thereunder, be obliged, under the District’s policy and procedure, to execute a supplemental agreement which would amend the contract price to reflect the new price determined by the Board and would provide that the payment would constitute a final conclusion of the matter. He stated that a business decision to accept immediately the moneys made available by the Board decision would, therefore, by the nature of the document plaintiff would have to execute to obtain the funds, preclude any further legal attempts to obtain a higher price determination.
15. In his discussions with defendant’s authorized representative, plaintiff’s attorney referred the representative to plaintiff’s officers and told him to make direct contact with them, advising that the determination of whether or not to accept the Board decision was essentially a business one for plaintiff’s officers to make. Thereafter, defendant’s representatives dealt only with plaintiff’s vice-president concerning the matter.
16. Plaintiff’s immediate pressing problem was the obtaining of funds with which to pay its supplier creditors, since they had agreed to await the liquidation of their past due accounts until the Board would decide plaintiff’s appeal, and were now pressing for payment. Plaintiff concluded that one way to relieve this situation, without committing itself to an acceptance of the Board decision, would be to treat the additional moneys made available under the higher price redetermination fixed by the Board decision as an account receivable under the Y-loan formula, and to make an additional borrowing on the loan. Plaintiff interpreted the Board decision as making available to it the sum of $824,-148.95. With this amount so considered as an account receivable, there would be sufficient to liquidate the outstanding V-loan balance of $203,000 as well as to make plaintiff eligible, under the loan formula, for further advances within the loan limit specified by the Loan Agreement. On May 14, 1957, plaintiff submitted an invoice to the appropriate officials of the New York Ordnance District in the amount of $324,748.95, and at the same time, describing said amount as “Adjustment in contract price and amount due in accordance with decision of Armed Services Board of Contract *856 Appeals * * * dated May 2, 1957”, applied to the National State Bank of Newark for an additional borrowing under its Loan Agreement in tbe amount of $139,700, treating said amount of $324,748.95 as an account receivable under the loan formula. However, the bank, after discussing the situation with the Federal Beserve Bank of New York and the Department of the Army (the guarantor), was advised that the Department would not consent to any further extensions of the loan beyond May 31, 1957, and that there should not, therefore, be any further borrowings against the loan. The principal reasons for this decision were that the loan had been carried, although in default, until plaintiff’s claim would be ultimately disposed of by the Department of the Army, and that it was now disposed of in a manner whereby the default could be removed and the loan repaid without any further extensions. Furthermore, there would, after the repayment of the balance of the V-loan, still be due and owing to plaintiff an amount substantially as large as the loan applied for, for plaintiff’s use in paying its creditors, so that the creditors would not have much longer to wait than if the additional advance against the V-loan was made immediately. The Department of the Army wanted the outstanding balance under the V-loan paid promptly from the proceeds due plaintiff 'under the Board’s decision.
Furthermore, production under the shell contract had been completed and the final shipments made almost a year earlier, i.e., in July 1956. Similarly, the other defense contracts plaintiff had and with respect to which the V-loan had also been granted were nearing completion and had very little backlogs of deliveries to be made. Since the sole purpose of a V-loan is to finance defense contracts, defendant’s representatives felt that the loan had served its purpose, that further borrowings against it would not be justified, and that the balance due on it should be paid promptly now that the Board decision made it possible for plaintiff to do so. As a result, the Department of the Army, the Federal Reserve Bank of New York, and the National State Bank of Newark withheld approval of plaintiff’s application to borrow the additional amount of $139,700 on the V-loan and, on May 17,1957, plaintiff was so advised.
*857 17. As a result of its failure to obtain further V-loan moneys, plaintiff made immediate efforts to obtain funds elsewhere. On or about May 17, 1957, plaintiff negotiated a loan for $200,000 from the Union County Trust Company, Elizabeth, New Jersey, the co-lender on plaintiff’s V-loan, although this loan was unrelated to the V-loan. As security for the loan, plaintiff assigned an income tax refund claim and 75 percent of plaintiff’s common stock. Partial payments to its creditors were made from the proceeds of this loan.
18. With the insistence of the Department of the Army that the V-loan be closed out without further extensions, and that the current balance of $203,000 be repaid at the May 31, 1957 maturity date, with its creditors pressing for liquidation of their past-due accounts, and with no avenue of obtaining any additional funds to satisfy these demands except that of accepting the moneys available to it under the Board decision, plaintiff’s officials concluded that they had no alternative but to take no further steps to contest the Board decision at that time and to do whatever was necessary to obtain payment of such moneys promptly and prior to May 31,1957. After the loan of $200,000 from the Union County Trust Company, plaintiff was unable to borrow further funds from any sources and was unable to interest investors in placing further equity capital in the business. Plaintiff reasonably concluded that its creditors would not be willing to wait much longer before receiving payment and might take some more drastic action to collect their past due accounts. The National State Bank of Newark also advised plaintiff’s officials to obtain the money made available by the Board decision and to close out the V-loan since the Department of the Army was in a position to demand repayment of the loan balance on May 31, 1957, and plaintiff would not have the means with which to meet such demand.
Based on the above considerations, plaintiff’s vice-president advised defendant’s representatives shortly after May 17, 1957, that plaintiff would accept the Board decision, that plaintiff’s invoice submitted on May 14, 1957, could be processed toward that end, and that plaintiff desired the moneys due as quickly as possible in order to liquidate its *858 V-loan prior to May 31, 1957. Defendant’s representatives stated that the necessary work incident to effecting payment would be commenced immediately, including the preparation of a supplemental agreement in the usual form designed to close out the contract.
19. The advice plaintiff’s attorney gave plaintiff (finding 14) as to the necessity of plaintiff’s executing a supplemental agreement which would amend the contract price to reflect the redetermined price fixed by the Board and which would also contain “final settlement” language in order to obtain the funds made available by the Board decision was accurate. Under the practice of the Department of the Army, if plaintiff took further steps with respect to the Board’s decision in an attempt to increase the price redetermination, the amount that was due it thereunder would not have been paid to plaintiff. This was in part due to the fact that if, as plaintiff knew, and as it was advised by its attorney, plaintiff took further steps to review the Board’s decision, the Department of the Army would likewise be in a position in the further proceedings to urge that the Board award was too high. Although the contract price fixed by the Board was $360,921.60 less than that urged by plaintiff, it was $324,748.95 more than theretofore fixed by the defendant. If the Department were ultimately sustained in its contention that the price fixed by the Board was too high, payment of the amount due thereunder prior to the final ruling might result in an excessive payment having been made. Thus, a payment prior to such a final ruling would be premature.
Under the Board’s rules and procedure, motions for reconsideration could be made within 30 days after the Board’s decision, but there was no requirement that the Board act within any particular period of time on such motion, nor is there any showing as to what the usual period of time was for the Board to act on a matter of this kind and complexity. Such a motion could be made by either party to the proceeding. If made, the matter would normally be considered by the full twelve-member Board, which would review the action of the three-member panel that rendered the decision.
*859 20. Promptly after being advised that plaintiff would accept the Board decision and the moneys made available thereunder, defendant’s officials immediately commenced preparation of a supplemental agreement designed to amend the contract price in accordance with the Board decision and to effectuate final payment to plaintiff of the moneys due under the contract. In this connection, defendant’s officials did not construe the Board’s calculation of the differences in the redetermined contract prices as constituting a determination of the actual dollar amount due to plaintiff for the shipments it had made. They treated the redetermined contract price as a ceiling, and then attempted to calculate, from the records available to them, how much had already been paid to plaintiff and what was the balance due on the new contract price basis determined by the Board. They felt that the balance due would not necessarily equal the $324,148.95 set forth in the Board opinion and in plaintiff’s invoice. Furthermore, in processing plaintiff’s invoice, and in attempting to calculate the balance due to plaintiff under the redetermined price fixed by the Board, defendant’s officials could not arrive at the $324,748.95 figure as in fact being the amount due. An internal reorganization of defendant’s invoice payment set-up during the period in which the instant contract was being performed left the New York Ordnance District with incomplete data concerning certain payments prior to the reorganization. Although it would have been possible for the District to assemble all the data from various sources within the Government, it would have been a time-consuming task. In view of plaintiff’s desire for an immediate payment, as well as defendant’s similar desire that the payment be made prior to May 31, 1957, defendant’s officials felt that the most expeditious procedure would be for plaintiff to submit a reconciliation of all prior payments it had received under the contract against the invoices it had submitted. In three instances, defendant’s records showed that the payments to plaintiff had been less than the invoices submitted, and they could not account for this discrepancy with the data they had. It thus appeared that plaintiff was possibly underbilling, or, if the discrepancies were due to credits allowed defendant, questions might *860 arise as to the basis and sufficiency thereof. Since defendant’s officials felt this would be the final payment and the final document executed under the contract, designed to take care of all open items, defendant’s officials wanted to make certain the contract would be accurately closed out. Consequently, plaintiff was requested to submit such a reconciliation to support the amount of $324,748.95, as set forth in its invoice, and in connection with the request, returned the invoice to plaintiff.
21. (a) Plaintiff’s officials refused to submit the reconciliation requested by defendant’s officials. They construed the Board’s decision as settling the issue of their entitlement to the sum of $324,748.95. They further felt that defendant’s officials had all the necessary data available to them and therefore could make their own reconciliation. In view of their desire for immediate payment, they resented the reconciliation request as time-consuming and as possibly opening up further controversies on past payments which should have been long settled, since the last shipment under the contract and the submission of the last prior invoice thereunder had taken place almost a year ago. They felt, therefore, that defendant had had ample time to clear up any discrepancies in their records. Plaintiff’s officials were, in any event, satisfied that the $324,748.95 figure set forth in the Board’s decision was the correct amount due to them, and insisted on immediate payment thereof. By letter of May 20,1957, plaintiff resubmitted the invoice, stating “This amount is in accordance with the decision of the Armed Services Board of Contract Appeals * *
(b) Although plaintiff’s officials were understandably provoked at this threat of delay in obtaining the funds they sorely needed, defendant’s officials did not intend to cause plaintiff any harassment by their request for a reconciliation. The request was grounded upon a good faith desire to make certain that plaintiff was being paid the exact final amount due it and that the contract was being closed out accurately. However, since defendant’s inability to recon *861 cile the previous payments made with, tbe amounts set forth, in plaintiff’s previous invoices involved events occurring approximately a year or more earlier, it is not shown why defendant’s officials could not, in ample time, have collected all the data necessary to have made their own reconciliation of past payments, and to have cleared up any discrepancies in their records, well prior to the Board decision.
(c) A reconciliation such as was requested by defendant’s officials would not have taken plaintiff more than approximately half a day to prepare.
(d) In view of the pressure being put upon defendant’s officials charged with processing the final payment due to plaintiff, both by plaintiff’s representatives, who were pushing for the completion of the supplemental agreement so that plaintiff could obtain the funds, and by defendant’s finance officials responsible for the handling of the V-loan, who were anxious to have the loan liquidated, the making of the final payment in the sum invoiced by plaintiff was approved by the contracting officer without a reconciliation and therefore without assurances that such sum was the correct final amount due plaintiff under the contract.
(e) Had there been presented the type of reconciliation that defendant’s officials desired, it would have shown that, except for one possible item of $30.03, the amount invoiced by plaintiff was in fact the correct amount due it under the contract. The explanation for the other two discrepancies in defendant’s records between the amount of plaintiff’s previous invoices and the amount of payments made thereon were all contained in records lodged in other offices of the Government, including the General Accounting Office. However, there is no satisfactory explanation in any of defendant’s records as to the $30.03 item. At the trial herein, it appeared that plaintiff gave defendant a credit in such amount, but no explanation appears in the record as to the basis therefor or as to its sufficiency or insufficiency, so that defendant still is unable to make a complete reconciliation. However, had defendant’s officials taken the opportunity *862 after the last shipment, and prior to the Board decision, to effect a reconciliation of all prior invoices and payments, and had they, in the course thereof, come across such discrepancy and sought an explanation thereof from plaintiff’s officials, there is nothing to indicate that plaintiff’s officials would not have readily explained the discrepancy and the basis for the $80.03 credit appearing on their boohs.
22. By the end of May 31, 1957, when the balance of the Y-loan became due and payable, the supplemental agreement being prepared by defendant to effectuate the payment of $324,748.95 had not as yet been completed and delivered to plaintiff for execution, nor had such payment as yet been made. Thus, the loan became in default on such date. However, no issue was made of this circumstance either by the National State Bank of Newark, the Federal Beserve Bank of New York, or the Department of the Army, since it was expected that the agreement would be completed and executed, and the payment would be made to plaintiff around the first week in June 1957, at which time the balance could be liquidated.
23. On May 31, 1957, plaintiff had, excluding the additional amount due to it as a result of the Board decision, working capital (i.e., current assets less current liabilities), of only $6,227.14. Its accounts payable totaled $295,540.40, and its notes payable, including the $203,000 payable on its V-loan, totaled $754,579.36. Since it was unable to borrow any additional money, it would, had its creditors insisted on payment of their accounts and notes on May 31, 1957, not have been able to operate as a going business unless it received the amount to which it was entitled under the Board decision.
24. Plaintiff’s financial plight was not attributable solely to its Government business. Prior to May 31,1957, and during the period in which plaintiff was performing the shell contract herein involved, as well as its other defense contracts, plaintiff was also engaged in manufacturing civilian *863 products, including kitchen cabinets. Plaintiff experienced large losses in its kitchen cabinet business, which division of its business it ultimately liquidated, and its serious financial condition in May 1957 was at least in part due to such factor. As shown by plaintiff’s profit and loss statement for the year ending December 31,1956, it had lost during such year $272,083.07 on its kitchen cabinet business. Of course, plaintiff’s financial condition subsequent to April 30, 1956, would have been considerably improved had the amount ultimately allowed it by the Board on May 2, 1957, been allowed by the contracting officer instead of the lesser amount such officer did allow on April 30, 1956. Including the additional amount of $324,748.95 to be paid under the Board decision, plaintiff still suffered a loss on the instant contract for the year ending December 31, 1956, of $123,-803.85. For that same year, however, plaintiff also suffered additional losses on other contracts, including two other Government contracts, of $85,879.94.
The result of 6 months’ operations ending June 30, 1957, was that plaintiff incurred an overall net loss of $105,511.53, with the loss on the kitchen cabinet business during said period amounting to $137,007.46. Thus, for that period, plaintiff’s business other than the kitchen cabinet business was profitable.
25. Defendant’s officials, including those employed by the New York Ordnance District and the Federal Reserve Bank of New York, were at all times herein involved, aware of, or had available to them the necessary data from which they could have ascertained, plaintiff’s financial difficulties. As a condition of the various extensions of the V-loan pending the Board decision, plaintiff was required to, and did, submit quarterly financial statements to both the Federal Reserve Bank and the New York Ordnance District. Following the unilateral determination, plaintiff’s financial plight was made known to all concerned at the meeting of May 24, 1956, attended by officials of these agencies, as well as by the National State Bank of Newark, at which meeting the *864 bank liad agreed to lend further funds to plaintiff against the security of its accounts receivable. Subsequently, the New York Ordnance District consented to the successive extensions of the maturity date of the V-loan to May 31,1957. The year-end statement showing plaintiff’s financial condition as of December 31,1956, was not submitted to defendant’s officials until May 9, 1957, a time extension having been granted for such submission since plaintiff wished to have reflected in it the result of the pending Board appeal and plaintiff’s financial condition would depend in part upon the Board’s action. When so submitted on May 9, 1957, it showed that as of December 31, 1956, and including the $324,748.95 set forth in the Board decision as an account receivable, plaintiff had liquid assets (consisting of accounts receivable and cash) of $852,818.96, as against current liabilities of $960,184.92. Its cash amounted to only $25,275.64 as against current accounts payable of $244,735.28. However, other nonliquid assets, such as an income tax refund claim, inventories, plant and equipment, showed that plaintiff was far from insolvent, its total assets amounting to $1,949,718.61 as against total liabilities of $1,035,184.92, leaving it with a “capital stock and surplus” account totaling $914,533.69, the surplus alone totaling $694,533.69. Plaintiff’s principal problem was its lack of liquidity and its consequent inability to pay its current bills. It was for this reason that it was so anxious to obtain the moneys represented by the Board decision as quickly as possible. Plaintiff’s creditors were quite tolerant of plaintiff’s situation and had refrained from taking drastic action to collect their overdue accounts because of plaintiff’s generally excellent reputation in the business community, of their confidence in plaintiff’s ultimately being able to work itself out of its difficulty, which they felt to be of a temporary nature, and of their satisfactory dealings with plaintiff over a period of years. However, plaintiff had no assurance how long their tolerance would last.
*865 26. On June 4,1957, plaintiff, by its vice-president (plaintiff’s president having died on May 24,1957), and defendant, by its contracting officer, entered into a supplemental agreement, termed “Modification No. 86.” In accordance with previous arrangements, upon being advised by defendant that the preparation of the supplemental agreement had been completed and was ready for execution by plaintiff, plaintiff had the agreement hand-carried to its offices for execution by it. The agreement was accompanied by a covering letter dated June 4, 1957, giving instructions as to its execution. After execution by plaintiff, the agreement was returned to the contracting officer who also executed it the same day. The agreement provided as follows:
MODIEIOATION NO. 86
supplemental AGREEMENT
TO
CONTRACT NO. DA-3 0-0 6 9-ORD-9 3 8
* * * * *
This supplemental agreement, authorized and negotiated under the authority of 10 U.S.C. 2304(a)(1), Public Law 1028, Chapter 1041, 84th Congress, and Presidential Proclamation 2914, entered into June 4, 1957, by and between the united states oe America, hereinafter called the Government, represented by the Contracting Officer executing this agreement, and hubeny brothers, Inc., a corporation organized and existing under the laws of the State of New Jersey with offices located in Roselle, in the State of New jersey, hereinafter called the Contractor, witnesseth that :
Whereas, the parties hereto entered into Contract No. DA-30-069-QRD-938, dated 5 September 1952, which as heretofore amended or supplemented is hereinafter called the Contract, and
Whereas, Article 36 of the Contract provides that, upon completion of delivery of 40 percent of Item 1 to be furnished thereunder, the parties thereto shall negotiate to revise the prices of all items theretofore and thereafter to be delivered, and
Whereas, in accordance with said Article 36, the Contractor submitted to the Contracting Officer the data required to be submitted thereunder, and
*866 Whereas, pursuant to said Article 36, tibe Contracting Officer made or caused to be made such examinations and audits of the Contractor’s cost data and books, records, accounts and other pertinent information, as he deemed necessary to negotiate fair and just compensation to the Contractor for performance of the contract, and
Whereas, in accordance with said Article 36, the Contracting Officer and Contractor negotiated in good faith determination dated 30 April 1956, which unilaterally to agree on prices for all items delivered and to be delivered under the contract, upon the basis of the Contractor’s cost data and books, records, accounts and other pertinent information, and
Whereas, as a result of such negotiations, the Contractor and Contracting Officer failed to agree upon redetermined prices in accordance with the provisions of said Article 36, and
Whereas, by reason of such dispute, the Contracting Officer issued to the Contractor a unilateral finding and redetermined the prices for all items delivered and to be delivered under the contract, and reduced the total contract price set forth in Supplemental Agreement No. 82 thereto by $257,346.49 from $3,648,322.39 to $3,390,975.90 to reflect price redetermination under Article 36 thereof, and
Whereas, pursuant to the provisions of Clause 12, entitled “Disputes”, of the contract, the Contractor duly appealed from the aforesaid findings and decision of the Contracting Officer to the Secretary of the Army by Notice of Appeal dated 9 May 1956, and
Whereas, said appeal was referred to the Armed Services Board of Contract Appeals as the authorized agency of the Secretary to hear and decide such appeals, and
Whereas, pursuant to the rules of said Board, the Government and the Contractor submitted their respective cases and filed the necessary documents in connection with said appeal, and
Whereas, after full consideration of all the oral and written evidence submitted in said appeal, and after careful consideration of the arguments of the Government and the Contractor submitted thereon, said Board *867 rendered its decision on said appeal dated 2 May 1957 under ASBCA No. 3629, and
Whereas, tbe parties hereto now desire to implement said decision by establishing the redetermined total contract price for complete performance of the contract at $3,683,422.55, as decided therein,
Now, therefore, in consideration of these premises and other good and valuable considerations, the receipt whereof is mutually acknowledged, it is agreed as follows:
1. In conformity with the aforesaid decision of the Armed Services Board of Contract Appeals, it is agreed by and between the parties hereto that the redetermined total contract price for complete performance of the contract is $3,683,422.55, which includes $74,206.55 of pre-production costs authorized for reimbursement under Supplemental Agreement No. 15 to the contract. The parties further agree that said amount of $3,-683,422.55 constitutes a full and complete settlement for complete performance of the contract.
2. Said redetermined total contract price includes an equitable adjustment which constitutes a full and complete settlement under the contract for compliance by the Contractor with all Change Orders and Contracting Officer’s Letters previously issued to the Contractor by the Government thereunder and not heretofore equitably adjusted.[1]
3. The price redetermination effected herein shall not be construed to waive the rights of the Government to subsequent renegotiation under any renegotiation laws applicable to the items called for under the contract.
4. It is further understood and agreed that as of 2 May 1957, the date of the aforesaid decision of the Armed Services Board of Contract Appeals, the aforesaid finding and determination of the Contracting Officer has been superseded by the aforesaid decision. As a consequence thereof, the parties hereto further agree that the total contract price of $3,648,322.39, set forth in *868 Supplemental Agreement No. 82 to the contract, shall be the basis for determining the required increase in the total contract price necessary to implement the price redetermination effected herein.
5. By reason of this Supplement Agreement (Modification No. 86), the total contract price is hereby increased by $35,100.16 from $3,648,322.39 to $3,683,422.55.
6. Except as herein otherwise expressly provided and/or amended, all the terms and conditions of the contract shall remain in full force and effect.
27. Payment of $324,748.95 under supplemental agreement No. 86 was made on or about June 10, 1957, to the National State Bank of Newark, plaintiff’s assignee. The V-loan balance was then liquidated, leaving approximately $122,000 to plaintiff for the payment of its other debts.
28. On June 16, 1957, plaintiff paid Eastern Tool & Manufacturing Company over $146,000 on its notes. However, this still left plaintiff with a balance due on its notes to Eastern of $10,000, and an open account balance of $83,000. At about the same time, plaintiff paid the Stone Container Corporation approximately $8,500. However, this still left a balance due of approximately $12,500.
29. Including the payment of $324,748.95, plaintiff was paid the total amount of $3,680,067.27 under the contract. Since the redetermined price found by the Board was $3,-683,422.55, there was an excess amount of $3,355.28 obligated to this contract. Accordingly, after said payment under supplemental agreement No. 86, such excess amount was de-obligated. The excess resulted partially from certain price concessions that plaintiff had made for permission to deviate slightly from certain contract requirements.
30. It would have been procedurally possible to have effected payment of the $324,748.95 to plaintiff without the execution by plaintiff of a supplemental agreement containing words of release or even without a supplemental agreement at all. A simple authorization or direction by the contracting officer to pay said amount would have been sufficient. However, as shown, such action would have been con *869 trary to the policy and procedures of the New York Ordnance District. Whether or not a contract in terms required it, it was the practice and policy of the District and its contracting officers to require such a supplemental agreement before payment of a Board price redetermination award would be made.
31. At the time plaintiff’s vice-president executed supplemental agreement No. 86 on plaintiff’s behalf, no officer or representative of plaintiff made or expressed, orally or in writing, to any representative of the defendant any reservation or dissatisfaction with respect to any of the provisions thereof, or indicate in any way that in signing and executing the instrument and in receiving the amount therein specified, plaintiff was reserving the right to press a claim or sue the defendant for any other or further sums under the contract in question in addition to the amount stated in the supplemental agreement. Plaintiff’s vice-president read the document before he signed it, and understood it, including the “full and complete settlement” language in paragraph 1. After receiving the agreement and before its execution by plaintiff, plaintiff’s officials again consulted with plaintiff’s attorney, were cognizant of the “full and complete settlement” language in paragraph 1, and knew that the attorney was of the opinion that the execution of the supplemental agreement would foreclose further action to obtain additional moneys under the contract. However, plaintiff’s vice-president felt nevertheless that, under the circumstances involved, he would not be foreclosed from taking appropriate steps to obtain further funds at some future time. He believed that defendant, with knowledge of plaintiff’s financial plight, was in fact compelling plaintiff to accept the Board decision and to obtain the moneys made available thereunder by insisting on payment of the balance of the V-loan by the end of the month. Further, since defendant required, under its procedures and policies, the execution of a supplemental agreement in the form presented before it would pay the *870 moneys, he felt he had no alternative but to sign in order to obtain the funds with which to repay the Y-loan, but he reasoned that any release, if such it was, executed under such circumstances of financial stress would not actually serve to prevent his taking further steps to obtain additional moneys at some future time should plaintiff then decide to take such action.
32. After the execution of supplemental agreement No. 86 and the payment of the amount provided thereunder, defendant’s officials considered all matters relating to the contract as closed. Thereafter, pursuant to applicable regulations relating to the maintenance of documents deemed to be no longer necessary, they periodically destroyed various records relating to the contract. However, pursuant to contract requirements, plaintiff did maintain all of its records pertaining to the contract.
33. On October 16,1957, plaintiff, by its president (being its former vice-president who had executed supplemental agreement 86), retained attorneys to attempt to obtain an additional amount under the contract herein involved. No notice was given to defendant at that time of such retention or of plaintiff’s intent further to prosecute its claim.
34. On July 18,1958, plaintiff, by its newly retained attorneys, filed a motion for reconsideration and rehearing before the Armed Services Board of Contract Appeals. The filing of this motion constituted the first knowledge by defendant that plaintiff intended to pursue its claim further. On September 2, 1958, the Army Contract Appeals Panel of the Board rendered its unanimous decision, stating as follows:
The Board’s decision on this appeal was issued on 2 May 1957. The dispute was as to what the redetermined price of a contract should be. We found the redetermined price to be $3,683,422.55 which was $360,921.60 less than requested by Appellant and $324,748.95 more than allowed by the Government.
Appellant has filed a motion for reconsideration dated 18 July 1958. Our rules require such motions to be filed within 30 days. Appellant has a twofold explanation *871 for its delay. The first is that while it realized our decision was wrong within the 80-day period it desperately needed the $324,748.95 which we had allowed but found that the Government would not pay this amount unless and until the Appellant signed a supplemental agreement to the contract accepting the $324,748.95 in full and final settlement under the contract. Appellant preferred to accept the $324,748.95 and by a timely motion for reconsideration to ask for more. When the Government would not agree Appellant gave up the idea of a timely motion for reconsideration, signed the supplemental agreement, and accepted the payment of the $324,748.95. Appellant’s motion states that payment was made on 10 June 1957. Appellant states that its need for the $324,748.95 was so pressing that under the circumstances it could not file a timely motion but had to agree to the supplemental agreement in order to get its money and then file an untimely motion for reconsideration. Appellant seeks to avoid the supplemental agreement on the basis of economic duress. The second is that Appellant, since it could not file a timely motion anyway, engaged other competent counsel to review the case and the press of this other counsel’s work prevented him from completing his review of the case until recently.
Under the provisions of the contract concerned the Appellant was entitled to our decision on the dispute and was entitled to a hearing on the dispute. It received both. The contract does not provide for reconsideration of decisions. The right to file a motion for reconsideration is granted by our Rule 29. The rule says that such motions shall be filed within 30 days. Unlike other rules which provide that the Board may extend time periods (e.g., Rules 5 and 6), Rule 29 makes no provision for an extension by the Board of the 30-day period.
Appellant cites several Federal cases holding that a court concerned may disregard its rules in a particular case when the interests of justice so require. Stating that we are a Federal instrumentality Appellant argues that we too can disregard our rules and accept Appellant’s motion, even though it was filed more than one year after Appellant received our decision.
We do not so construe our rules. We consider motions *872 for reconsideration only when they are filed within the 30-day period prescribed.
Appellant’s motion for reconsideration is dismissed.
35. On September 9, 1958, plaintiff requested a hearing before the full Board to effect a reversal of the denial of appellant’s motion for reconsideration. On October 16,1958, plaintiff’s request was denied.
36. (a) On December 4, 1958, the petition herein was filed. A redetermined contract price of $360,921.60 higher than that allowed by the Board is claimed. Paragraph 26 of the petition recites the execution of supplemental agreement No. 86 but alleges that its execution by plaintiff “is not a valid waiver or relinquishment of plaintiff’s claim herein since it was obtained by economic duress.”[2] On May 15, 1959, defendant filed its answer herein in which it contended, in two affirmative defenses, that plaintiff’s execution of said supplemental agreement and receipt of the moneys recited therein constituted a full and complete settlement of all sums due plaintiff under the contract, barring plaintiff from asserting any further claim against defendant under the contract, that payment of said moneys constituted an accord and satisfaction, and that plaintiff was guilty of laches in having failed to assert, when it executed the supplemental agreement and received said moneys, that any further sums were due it under the contract.
(b) By order of October 7,1959, the court allowed the joint motion of the parties that the issues referred to in paragraph 26 of the petition and the affirmative defenses of the answer be tried and decided separately from, and prior to, all other issues raised by the petition and answer.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Three change orders, Nos. 83, 84, and 85, had theretofore been Issued, but no determination had ever been made as to whether any costs had been incurred in fulfilling them. However, it was ascertained that plaintiff was claiming no additional costs in connection therewith, and defendant also felt it was necessary to close out the cost aspects of these change orders in this agreement between the parties.

 On February 2, 1960, the petition was amended so as to add to paragraph 26 the further allegation that the supplemental agreement is not binding because of laek of consideration.